IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Barrick Jermaine Mills,      ) | Civil Action No. 6:15-3276-RMG-KFM |
|      Plaintiff,   ) | |
|      ) | **REPORT OF MAGISTRATE JUDGE** |
| vs.      ) | |
|      ) | |
| Carolyn W. Colvin, Acting   ) | |
| Commissioner of Social Security,   ) | |
|      ) | |
|      Defendant.   ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for supplemental security income ("SSI") benefits on April 4, 2012, alleging disability commencing January 1, 2004. The application was denied initially and on reconsideration by the Social Security Administration. On June 10, 2013, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, an impartial vocational expert, appeared on April 22, 2014, considered the case *de novo*, and on May 12, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding

---

[1]A report and recommendation is being filed in this case in which one or both parties declined to consent to disposition by the magistrate judge.

became the final decision of the Commissioner of Social Security when the Appeals Council

denied the plaintiff's request for review on July 24, 2015. The plaintiff then filed this action

for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the

Commissioner has adopted the following findings of the ALJ:

> (1)    Claimant has not engaged in substantial gainful activity since April 4, 2012, the application date (20. C.F.R. § 416.971 *et seq.*).

> (2)    Claimant has the following severe impairments: psychotic disorder not otherwise specified, anti-social personality disorder, rule out schizoaffective disorder versus drug-induced mood/psychotic disorder, cannabis abuse, cocaine abuse, alcohol abuse, post-traumatic stress disorder (PTSD), and major depressive disorder (20 C.F.R. § 416.920(c)).

> (3)    Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

> (4)    After careful consideration of the entire record, the undersigned finds that claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.967(c) with some additional limitations.  Specifically, claimant can lift and carry 50 pounds occasionally and 25 pounds frequently. He can sit, stand, and walk for 6 hours each in an 8-hour day. Claimant must avoid moderate use of moving machinery and unprotected heights.  He is limited to performing simple, routine, repetitive tasks in a work environment free of fast-paced production requirements.  He is limited to a low-stress setting, meaning in a setting involving only simple work-related decisions and few, if any, workplace changes. Claimant may have only occasional interaction with the public.

> (5)    Claimant is unable to perform any past relevant work (20 C.F.R. § 416.965).

> (6)    Claimant was born on February 10, 1976, and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).

2

(7)    Claimant has a marginal education and is able to communicate in English (20 C.F.R. § 416.964).

(8)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(9)    Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a)).

(10)    Claimant has not been under a disability, as defined in the Social Security Act, since April 4, 2012, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that

3

equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* § 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

According to notes from the Charleston/Dorchester Mental Health Center ("CDMH"), the plaintiff was hospitalized at Palmetto Lowcountry Behavioral Center ("Palmetto Behavioral") with symptoms of psychosis from October 29-31, 2008 (Tr. 491).

On January 18, 2012, the plaintiff was involuntarily admitted to Palmetto Behavioral with a diagnosis of cocaine abuse, cannabis abuse, psychosis, depression, and thoughts of hurting himself. At the time of admission, the plaintiff was talking to a dog that was not in the room. He expressed suicidal and homicidal ideation. He reported having auditory, visual, and tactile hallucinations (Tr. 380-88). During the course of this involuntary commitment, the plaintiff underwent a psychiatric evaluation by Ira L. Rosenshein, M.D., Ph.D., on January 19, 2012. The plaintiff expressed abusing drugs, suffering multiple hallucinations, periods of paranoia, and instances in which voices encouraged him to hurt himself and others. His insight and judgment were seen as poor. He reported prior hospitalizations--one after he walked into Palmetto Behavioral with a bloody knife in 2009 and one with crisis stabilization in 2008. His mother reported that she did not feel safe with him at home. Treatment plan included a full initial mental health screening. The plaintiff

was discharged on January 30, 2012, having "achieved baseline" with a Global Assessment of Functioning ("GAF") of 60.[2]  He was to follow up with CDMH (Tr. 393-401).

On January 31, 2012, the plaintiff underwent an initial clinical assessment at CDMH (Tr. 294-99).  As a result of his recent hospitalization, the plaintiff reported that he was court-ordered to undergo treatment for the next 36 months.  He had been hospitalized three times before at Palmetto Behavioral.  He also reported having witnessed and been a victim of numerous acts of violence.  He complained of auditory and visual hallucinations.  The plaintiff stated that he would drink and consume marijuana until he blacked out.  He denied current suicidal or homicidal ideology but admitted to previous suicide attempts and acts of violence intending to kill others.  He stated that he dropped out of school in the eighth grade because of "legal troubles."  It was advised that the plaintiff could benefit from individual and group therapy, as well as involvement with the Charleston County Center for Substance Abuse.

The plaintiff's plan of care included a primary diagnosis of psychotic disorder. There were additional diagnoses of alcohol abuse, cannabis abuse, nicotine dependence, cocaine abuse, and antisocial personality disorder (Tr. 300-302).  There was significant concern about the plaintiff's use of crack cocaine.  He stated that he preferred to be incarcerated because he could get whatever drugs he wanted there.  There was significant

---

[2]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

concern that he would start using crack again if he was not engaged in a rehab/treatment program (Tr. 413).

A CDMH note dated February 8, 2012, recorded that the plaintiff was having significant difficulties managing his health care (Tr. 414).

A clinical service note from CDMH dated February 14, 2012, recorded continued significant auditory and visual hallucinations. The plaintiff expressed a desire to be in a "happy place" and to learn to manage his symptoms (Tr. 415). A note dated February 15, 2012, outlined a meeting with the plaintiff for the purpose of providing rehabilitative psychological services. He admitted not being compliant with his medications nor with attending all of his scheduled therapy appointments (Tr. 416).

On March 6, 2012, CDMH staff noted that the plaintiff was trying to manage his condition but still was not completely compliant with his medications (Tr. 418). On March 20, 2012, the plaintiff was having disturbing hallucinations concerning "aliens." He was staying in his home and keeping to himself because of his disturbing thoughts (Tr. 422). Later that month, he admitted to ongoing issues with marijuana usage (Tr. 423).

On April 23, 2012, the plaintiff was transported by ambulance to MUSC after seeing "aliens" whom he believed were telling him to hurt himself and others. It was noted that he had been incarcerated from the age of 13 through 34 and had been administered "meds" for an unknown diagnosis of a condition that included auditory hallucinations. In addition, he had a history of psychosis, depression, anxiety, and polysubstance abuse. He also established a history of believing that he was interacting with aliens who appeared to be human. The plaintiff had also been inconsistent in taking medicines prescribed by CDMH, including Seroquel, Zoloft, and Trazodone. There was also significant family history of schizophrenia and other mental illnesses. The plaintiff tested positive in the emergency room for cocaine and cannabis. The plaintiff did not meet the criteria for inpatient

7

hospitalization and reported feeling safe going home with no thoughts or intentions to harm himself or anyone else (Tr. 262-67).

A CDMH progress summary covering the dates January 31, 2012, through April 30, 2012, revealed that the plaintiff continued to struggle with alcohol and illicit substances and had sought hospitalization. His continued hallucinations were also creating strain within his family (Tr. 302).

On May 1, 2012, the plaintiff was experiencing increased stress because he could not "get himself together" (Tr. 449). He reported feeling like he was "losing it" and did not have transportation to keep his scheduled therapy appointments. He revealed that he was self-medicating with marijuana because it made the "aliens" go away.

On May 21, 2012, the plaintiff was seen for a crisis intervention because he was extremely agitated and paranoid (Tr. 452). He had been transported to MUSC, but refused to stay and became agitated when told there were no available beds at Palmetto Behavioral, so he returned home.

On May 24, 2012, the plaintiff stated that he was continuing to have difficulties with managing his symptoms and working towards recovery(Tr. 453). He reported feeling "out of control." Clinical service notes dated June 22, 2012, reported that the plaintiff was doing better and reported not having taken any illicit drugs in the recent past which allowed him to stabilize his condition somewhat (Tr. 455).

On July 14, 2012, the plaintiff was examined by Patricia A. Quaine, M.D., at the request of the state agency. The chief complaint and allegations were psychotic disorder, polysubstance abuse, and migraine headaches. The plaintiff stated that in 1996 he was diagnosed with schizophrenia, post-traumatic stress disorder ("PTSD"), depression, and anxiety. He also had a history of suicide ideation and attempts. He suffered severe migraines but did not seek medical attention for them. At the time of the examination, he was prescribed Trazodone and Seroquel. The plaintiff also had a long history of substance

8

abuse.   He was "a little disheveled in the office and was wearing pajamas."  Dr. Quaine performed a physical examination of the plaintiff, finding that he was awake, alert, oriented, and in no apparent distress and had normal gait, no limitations in range of motion, no neurologic difficulties, normal motor strength in all extremities, was able to do rapid alternating movements of hands without difficulty, and was able to tandem-walk, heel-walk, and toe-walk without difficulty.  Dr. Quaine's impression was that the plaintiff was suffering from psychosis, schizophrenia, depression, and anxiety, but opined that a formal assessment by a psychiatrist would be helpful in the case (Tr. 273-76).

On July 16, 2012, the plaintiff attended a consultative examination with psychiatrist John Custer, M.D., in connection with his SSI application.  Dr. Custer observed that the plaintiff was a poor historian of his own background and suggested that "the information obtained should be judged accordingly."  He stated that the plaintiff suffered from migraines, nightmares, auditory hallucinations, depression, and anxiety.  The plaintiff stated that he had been the victim of a serious auto accident that left him with auditory hallucinations in its aftermath.  He had also been incarcerated for most of his adult life, with significant difficulties in readjusting to society upon release.  The plaintiff described in detail paranoid thoughts that centered around aliens being "out to get him."  He also experienced auditory hallucinations that prompted him to hurt others.  The plaintiff stated that he was taking Seroquel, Zoloft, Trazodone, and Ativan.  He was also involuntarily committed to Charleston Mental Health Center.  In addition, he was also hospitalized two or three times at Palmetto Behavioral.  He also stated that he was physically abused as a child and expressed suicidal ideation.  The plaintiff was in special education classes until the seventh grade when he dropped out.  The plaintiff did not know the date of the examination or the name of the current president.  The plaintiff's inability to read made cognitive testing difficult. Dr. Custer stated that the presentation of psychotic symptomology was "somewhat unusual" and that "the possibility of malingering cannot completely be ruled out" but

9

provided no further explanation or evidence. Dr. Custer opined that with continued treatment it was likely that his symptoms would stabilize. He noted that there were potential substance abuse and antisocial personality issues which further impeded his functioning. He felt the plaintiff could not manage his own finances (Tr. 276-80).

On July 20, 2012, the plaintiff reported "struggling" a little bit and experiencing auditory hallucinations. He had not taken Seroquel for four months (Tr. 429, 457).

A progress summary from CDMH covering the dates April 30, 2012, through July 29, 2012, revealed that he was still struggling with marijuana abuse as well as delusions and hallucinations (Tr. 303).

In August 2012, Michael Neboschick, Ph.D., a state agency psychologist, reviewed the evidence in connection with the plaintiff's initial application (Tr. 63-74). Dr. Neboschick opined that in light of the evidence, including consultative examiner Dr. Custer's assessment, the plaintiff's treatment records, and his daily activities, the plaintiff could perform simple, unskilled work that did not involve ongoing interaction with the public (Tr. 72).

A CDMH clinical service note from November 6, 2012, noted that the plaintiff stated "maybe I need to go check into Palmetto" (Tr. 306). This followed an incident in which the plaintiff felt that he had put his life and his girlfriend's life in danger. He also stated that he was not taking his prescribed medicine because he could not afford them. The provider opined that the plaintiff made multiple excuses for not taking responsibility for his wellness and that he was challenged on this point because the Zoloft and Trazoadone were not expensive and the Seroquel was "PAP,"[3] and the plaintiff had not gone to pick up the medicine. The plaintiff was told to check with "PAP" before leaving the clinic, but he did

---

[3]"PAP" is the Prescription Assistance Program.

not do so (Tr. 306). Several days later, Trazodone was discontinued due to being overly sedating (Tr. 312).

From December 9-17, 2012, the plaintiff was committed to Palmetto Behavioral secondary to psychotic symptoms (Tr. 473-75). The plaintiff was uncooperative during the admission process and would not answer questions during his initial evaluation. He tested positive for tetrahydrocannabinol ("THC"), cocaine, benzodiazepines, and tricyclic antidepressants. Upon admission, he experienced auditory and visual hallucinations and was positive for manic and psychotic symptoms. His judgment and insight were severely impaired. The patient remained suicidal and homicidal and experienced hallucinations throughout his stay. He improved significantly and was discharged with a GAF score of 60; and he had a good prognosis depending on his compliance with aftercare (Tr. 473-75).

From late December 2012 through March 2014, the plaintiff continually reported doing well and being compliant with medication (Tr. 316, 498-500, 517-19, 522, 524, 544-45). The plaintiff was receptive to therapy during which his therapist spoke with him "about the importance of him removing those individual[s] in his life that bring chaos and confusion," with which the plaintiff agreed (Tr. 316).

During the relevant period, the plaintiff's outpatient mental health providers generally found that he was cooperative with a euthymic mood and good/fair insight and judgment (Tr. 307-08, 312, 419, 429-30, 434, 458-59, 500-03, 517, 522-25, 544-45). His outpatient providers did not document that he appeared to be responding to internal stimuli during office visits (Tr. 22; *see* Tr. 307-08, 312, 419, 429-30, 434, 458-59, 500-03, 517, 522-25, 544-45). The treatment notes consistently document the plaintiff's memory, concentration, and attention to be intact (Tr. 307-08, 312, 419, 429-30, 434, 458-59, 500-03, 517, 522-25, 544-45). Additionally, treatment notes generally document GAF scores of at least 55 and as high as 70 (Tr. 308, 420, 430, 435, 459, 498, 499, 501, 503, 517, 518, 519, 523, 525, 545).

11

CDMH notes dated January 10, 2013, addressed efforts to help the plaintiff deal with his anger issues (Tr. 318). The plaintiff noted stress in his life related to negative individuals and mismanagement of his prescription medicines. On February 19, 2013, the plaintiff's Seroquel was increased (Tr. 502).

On February 20, 2013, psychologist Jennifer Bennice, Ph.D., consultatively examined the plaintiff at the request of the state agency (Tr. 281-83). At that time, the plaintiff denied past or present use of illicit substances (Tr. 282-83). The plaintiff stated that he completed schooling through the sixth grade, but denied having attended special education classes. He denied any employment history. He stated that he had been incarcerated for most of his life, but that five years was the longest single sentence he had received. He endorsed depression, anxiety, and paranoia. He admitted to auditory and visual hallucinations, as well as previous suicidal ideation. Thought content was positive for paranoia, as well as suicidal and homicidal ideation. Dr. Bennice opined that the plaintiff endorsed chronic symptoms of depression and psychosis, including suicidal and homicidal ideation, paranoia, and hallucinations and suggested that he be closely watched. She opined that while compliance with his prescriptive regimen might manage his symptoms, she felt the plaintiff would be "significantly limited" in his abilities to maintain employment (Tr. 283).

In March 2013, Olin Hamrick, Jr., Ph.D., another state agency psychologist, reviewed the evidence in connection with the plaintiff's request for reconsideration (Tr. 78-94). Dr. Hamrick reviewed Dr. Bennice's opinion (Tr. 80, 88), and concluded that it was inconsistent with the evidence, including the mental health counseling notes and the plaintiff's denial of his substance use to Dr. Bennice, raising doubt about the credibility of the plaintiff's presentation at the examination (Tr. 88). Dr. Hamrick found that in light of the entire record, the plaintiff could perform simple work that involved no ongoing interaction with the public (Tr. 91-92).

On April 4, 2013, the plaintiff underwent an examination by Barry Weissglass, M.D., at the Carolina Center for Occupational Health.  The plaintiff was examined related to complaints of back pain, migraines, and schizophrenia.  The plaintiff stated that his back pain and migraines were associated with being hit by a car in 1997.  He rated the back pain as an eight or nine on a scale of ten and stated that the migraines were often so intense that he would blackout and were otherwise associated with auditory hallucinations.   Dr. Weissglass opined that the plaintiff had "very little if any symptoms or limitation of his back." He also opined that what the plaintiff believed were migraine headaches were really symptoms of uncontrolled schizophrenia.   He finally opined that given the plaintiff's schizophrenia, his account of auditory hallucinations "may be a significant concern in terms of any employment."  In this regard, Dr. Weissglass opined that the plaintiff would need to avoid employment involving interpersonal relationships and that he would require additional support and supervision in the workplace (Tr. 286-89).

In May 2013, the plaintiff was noted to be "doing well" and compliant with his medication (Tr. 500).  A progress summary covering the period from May 1, 2013, through July 30, 2013, revealed that the plaintiff was doing well by properly managing his medications and gaining insight into his disease (Tr. 517).  He continued to be "about the same" through November 2013 (Tr. 518-24).

On December 5, 2013, the plaintiff was seen at the Franklin C. Fetter Family Health Center ("Fetter Center") for treatment of pain in his shoulder (Tr. 528).

A CDMH progress summary covering the period from October 28, 2013, through January 26, 2014, noted that the plaintiff had been arrested during this period and had missed several appointments with therapists (Tr. 519).  On March 5, 2014, the plaintiff sought treatment with the Fetter Center to address complaints of chronic pain in his back and shoulders (Tr. 526).

Notes dated March 25, 2014, indicated that the plaintiff was doing "about the same," although he had become involved in an "altercation" at his church (Tr. 544). On March 25, 2014, the plaintiff underwent a lumbar spine x-ray, which revealed disc height loss at L4-5 (Tr. 548).

On April 9, 2014, Charles Effiong, M.D., of the Fetter Center completed a Medical Assessment of Ability to Perform Work-Related Activities (Physical). In this report, Dr. Effiong opined that the plaintiff was not able to perform sustained work activity for an eight-hour work day, five days a week. Among his limitations, the plaintiff would be unable to sit for more than two hours over the course of a eight-hour work day (Tr. 546).

On August 4, 2014, the plaintiff underwent a psychological evaluation by Gene J. Sausser, Ph.D. (Tr. 553-57). The plaintiff related that he "was never the same" after being hit by a car in 1996. His medications included Seroquel, Proaltroex, Mirtazapine, Axetil, Avetiappine, and a shot in the mental health center twice a month. He scored a Full Scale IQ score of 48 or 0.1%, which indicated a moderate intellectual disability. His Wide Range Achievement Test-4 scores indicated performance at "very elementary levels" and was consistent with his measured intellectual level. He stated that he had been sexually and physically abused as a child. He described interactions with aliens. The plaintiff made clear that the most important aspect of his attempt to secure disability benefits was to obtain medicines with regularity. While the plaintiff could complete most activities of daily life, he reported no socialization and had difficulty with concentration, persistence, and pace. Dr. Sausser diagnosed the plaintiff as suffering from moderate mental retardation, schizoaffective disorder (depressive type), and residual effects of childhood sexual abuse.

At the administrative hearing, the plaintiff stated that he was 38 years old and shared an apartment with his mother (Tr. 30-31). Prior to that, he was homeless and before that he lived with his father (Tr. 32). The plaintiff was uncertain about which grade was the last he completed; he was uncertain whether it was fourth, fifth, or sixth grade, although he

14

thought it was fifth grade.  While he was in school, he was in the "slow" class.  He cannot read or write very well, although he was able to take and pass the driver's license exam (Tr. 33)r.

The plaintiff testified that his last job was working construction in 1997 and had not worked since he was struck by an automobile in 1997 (Tr. 34, 181-82).  The plaintiff had been incarcerated for many years, including a five-year imprisonment lasting through September 2011, seven months before he applied for SSI (Tr. 23; *see* Tr. 49-54, 56, 274, 294, 407, 423).  He stated that he was currently taking Zoloft, Prazosin, and Seroquel, but had taken more than those drugs over time (Tr. 34).  The plaintiff testified he had been involuntarily committed in 2012 (Tr. 35).  He testified that he went back to the hospital again after he stopped taking his medicines and "got postal."  The plaintiff testified that he was currently managing his medicines and that they were helping him.  He was also interacting with his case worker and his doctor at the mental health center (Tr. 36).  He also stated that he was in a drug education class and had not used marijuana in two months or cocaine in six months (Tr. 37).  The plaintiff testified that he looked for work, but had difficulty being hired due to his criminal record (Tr. 56).  He testified that he could not work, because he could not work around people.  He also stated that back pain was a deterrent to working (Tr. 38).

The plaintiff testified that he continued to have auditory hallucinations and disturbing thoughts focused on past traumas (Tr. 41).  He testified that as a result of being hit by a car, he had experienced back pain and a loss of memory (Tr. 43).  The plaintiff testified that he was able to do a little bit of cleaning around his mother's apartment, and he prepared meals and watched televison (Tr. 44-45, 55, 281).  The plaintiff attended church twice a week, accompanied his mother to the grocery store, played basketball and football for fun and dined out with his daughter (Tr. 46, 56-58, 421).

The plaintiff testified that he did not have friends because "they're human aliens" and "they do demons" (Tr. 46). He stated that he did not want to be out in public because "people they do the devilish things, and like they be trying to kill me. I don't know why they want to kill me for no reason" (Tr 47). He believed people are human aliens "trying to take a soul" because that was what the voices told him (Tr 48).

The plaintiff testified that he was incarcerated for failing to stop for a blue light and for drug possession (Tr. 49). The plaintiff also testified he had trouble concentrating (Tr. 54). He could not run to the store to pick up things for his mother at the grocery store. The only money he has is money given to him by his mother to be donated to the church (Tr. 58).

During the hearing, the vocational expert testified that the plaintiff would not be able to perform his past relevant work. He identified other jobs that involved infrequent contact with the public that would possibly accommodate a worker such as the plaintiff, including janitor, laundry operator, and hand packager (Tr. 60). The vocational expert testified that if due to a combination of medical conditions and mental impairments a person were to be off task for more than an hour a day, all available jobs would be eliminated. The result would be the same if an individual were to miss more than two days of work a month or were unable to concentrate for more than thirty minutes at a time (Tr. 61).

## ANALYSIS

The plaintiff 36 years old at the time he applied for SSI, and was 38 years old on the date of the ALJ's decision (Tr. 177). He has a fifth or sixth grade education (Tr. 25) and last worked in 1996 (Tr. 181-82). The plaintiff argues that the ALJ erred by (1) failing to properly consider the opinion evidence in the record and (2) improperly evaluating his credibility.

### *Opinion Evidence*

The plaintiff first argues that the ALJ erred in evaluating the opinion evidence and particularly the opinion of consultative examiner Dr. Bennice (doc. 14 at 13, 15, 17), who

opined in February 2013 that while compliance with the plaintiff's prescriptive regimen might manage his symptoms, she felt the plaintiff would be "significantly limited" in his abilities to maintain employment (Tr. 283).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

17

The ALJ gave "little weight" to Dr. Bennice's findings (Tr. 25). As the ALJ explained, Dr. Bennice's opinion that the plaintiff had a limited ability to maintain employment was inconsistent with the evidence (Tr. 25; *see* Tr. 283). *See* 20 C.F.R. § 416.927(c)(3)-(4) (explaining that an opinion will be given more weight if it is supported by an explanation and evidence and if it consistent with the record as a whole). The ALJ explained that the opinion was inconsistent with the benign findings documented by the plaintiff's outpatient mental health providers (Tr. 25; *see* Tr. 307-08, 312, 419, 429-30, 434, 458-59, 500-03, 517, 522-25, 544-45). As the ALJ noted, during the relevant period, outpatient providers did not document that the plaintiff appeared to be responding to internal stimuli during office visits (Tr. 22; *see* Tr. 307-08, 312, 419, 429-30, 434, 458-59, 500-03, 517, 522-25, 544-45).[4] The plaintiff was consistently noted to be cooperative (*id.*). In addition, his providers generally found that he had a euthymic mood with good/fair insight and judgment (*id.*). The treatment notes consistently document the plaintiff's memory, concentration, and attention to be intact (*id.*). Additionally, as the ALJ also noted, the plaintiff's treating providers generally assessed GAF scores of at least 55, and as high as 70, which indicates only moderate to mild symptoms/limitations (Tr. 22, 23; *see* Tr. 308 (GAF 58), 420 (55), 430 (55), 435 ( 55), 459 (55), 498 (70), 499(65), 501 (50), 503, 517 (65), 518 (65), 519 (60), 523 (60), 525 (60), 545 (60)).

The ALJ further found that Dr. Bennice's opinion was inconsistent with that of Dr. Custer, another psychological consultative examiner (Tr. 25). Specifically, Dr. Custer noted that the plaintiff's psychotic symptoms were "somewhat unusual in their presentation and therefore the possibility of malingering cannot completely be ruled out" (Tr. 279-80).

---

[4] The plaintiff argues that he "repeatedly presented to treating medical personnel in the company of his dog, Popcorn - completely imagined" (doc. 14 at 14). However, the only reference to such in the record the undersigned has found was on the day the plaintiff was admitted to Palmetto Behavioral in January 2012 (Tr. 386, 401). At the time of his discharge, the plaintiff denied any auditory or visual hallucinations (Tr. 387).

The plaintiff also denied past or present substance use to Dr. Bennice, thus indicating that Dr. Bennice did not have accurate information in forming her opinion (Tr. 25; *see* Tr. 282-83).  Based upon the foregoing, the ALJ adequately explained his reasoning, and his decision to give little weight to the non-treating source's conclusory opinion is based upon substantial evidence.

The ALJ further gave significant weight to the opinions of state agency psychologists Drs. Neboschick and Hamrick that the plaintiff could perform simple, unskilled work involving limited interaction with the public (Tr. 24; *see* Tr. 72, 91-92).  Notably, Dr. Hamrick reviewed Dr. Bennice's opinion, and, like the ALJ, concluded that it was inconsistent with the evidence, including the mental health counseling notes, and was undermined by the plaintiff's denial of his substance use to Dr. Bennice, which raised doubt about the credibility of the plaintiff's presentation at the examination (Tr. 80, 88).  The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. § 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

19

The plaintiff further argues that the ALJ "failed to discuss" the following medical "opinions" (doc. 14 at 16-17; doc. 16 at 2-3): (1) diagnoses given during inpatient treatment at Palmetto Behavioral from January 18-30, 2012 (Tr. 386-88, 393-401); (2) diagnoses given during an initial clinical assessment on January 31, 2012, at CDMH (Tr. 300-302); diagnoses given in April 2012 at MUSC (Tr. 266-68); (3) symptoms and diagnoses noted during a December 2012 hospitalization at Palmetto Behavioral (Tr. 472-79); (4) a July 2012 consultative examination by Dr. Quaine, who performed only a physical examination of the plaintiff (Tr. 273-75); and (5) the April 2014 opinion of Dr. Effiong (Tr. 546-57).

However, as argued by the Commissioner, none of the evidence cited by the plaintiff is a medical opinion of disabling mental work-related limitations. *See* 20 C.F.R. § 416.927(a)(2) (explaining that a medical opinion is a statement "reflecting judgments about the nature and severity" of an individual's impairment, including symptoms, diagnosis and prognosis, what the individual can still do despite his impairment, and the individual's mental or physical restrictions). Specifically, the ALJ explicitly considered Dr. Quaine's physical evaluation and noted that her findings were benign. As the ALJ noted, Dr. Quaine reported that her musculoskeletal examination revealed no limitation in range of motion, no muscle tenderness or spasm, no crepitations, no joint effusion or atrophy, and a normal gait (Tr. 18; *see* Tr. 273-75). The ALJ also specifically considered the opinion of treating physician Dr. Effiong, who assessed only physical – not mental – limitations. As noted by the ALJ, Dr. Effiong provided a handwritten note specifying that all of the limitations he indicated were based on subjective patient input and than no objective testing had been done in that office (Tr. 24; *see* Tr. 546-47). Further, the x-rays attached to Dr. Effiong's opinion showed only mild disc height loss at L4-5 and no other abnormalities (Tr. 24; *see* Tr. 548-49). Accordingly, the ALJ's decision to give this opinion no weight is based upon substantial evidence. Moreover, the ALJ accounted for any limitation the plaintiff may experience

relating to his subjective complaints of back pain and right shoulder effusion in limiting the plaintiff to medium work (Tr. 23).

Furthermore, a diagnosis of a psychological impairment is not an opinion of disabling limitations. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss."). The ALJ explicitly discussed the January (predating the relevant period),[5] April, and December 2012 treatment notes, in which the plaintiff was either not admitted or improved with treatment and was given a GAF of 60 (Tr. 21-23; *see* Tr. 387-88, 438, 475). The ALJ additionally observed that the plaintiff's outpatient treatment providers documented generally benign clinical findings (Tr. 22). As the ALJ found, the treatment records reflect that the plaintiff experienced improvement in his symptoms when compliant with treatment and exacerbations in symptoms when he was non-compliant and/or when he engaged in the use of illicit substances (Tr. 22).

As argued by the Commissioner, the cited portions of the record are not opinions of work-preclusive mental limitations. *See* 20 C.F.R. § 416.927(a)(2) (explaining that a medical opinion is a statement "reflecting judgments about the nature and severity" of an individual's impairment, including symptoms, diagnosis and prognosis, what the individual can still do despite his impairment, and the individual's mental or physical restrictions). Thus, the ALJ did not "fail to address . . . medical opinions and reach[] a conclusion that was diametrically opposed to them" as argued by the plaintiff (doc. 14 at 17). Accordingly, this allegation of error is without merit.

---

[5]A claimant is not eligible for SSI until the date on which he files an application for benefits, which the plaintiff here did on April 4, 2012 (Tr. 12, 177). *See* 20 C.F.R. § 416.202; *see also* 20 C.F.R. §§ 416.335, 416.501 (stating that a claimant may not be paid SSI for any time period that precedes the first month following the date on which an application was filed). An application remains in effect until the date of the ALJ's decision. 20 C.F.R. § 416.330.

***Credibility***

The plaintiff further argues that the ALJ erred in assessing his subjective complaints (doc. 14 at 13-15). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original). In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006). However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not

> substantiated by objective evidence of the pain itself or its
> severity, they need not be accepted to the extent they are
> inconsistent with the available evidence, including objective
> evidence of the underlying impairment, and the extent to which
> that impairment can reasonably be expected to cause the pain
> the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

23

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. § 416.929(c).

The ALJ found that, while the plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible (Tr. 21).  The ALJ found that the plaintiff's allegations were inconsistent with the clinical findings of his outpatient treatment providers (discussed above) as well as his daily activities (Tr. 20-24). As the ALJ found, the evidence demonstrated the ability to perform simple, routine work (Tr. 23-24).  Although the plaintiff had a limited education, he could read and write and was able to pass the written examination to obtain a driver's license (Tr. 23-24; *see* Tr. 32-33). Additionally, he cleaned, prepared meals, and watched television (Tr. 18, 24; *see* Tr. 44-45, 55, 281).  The plaintiff notes that during his January 2012 hospitalization, his mother reported that the plaintiff would get lost in the cleaning process and she would need to intercede, or she would find him aimlessly wandering the neighborhood (doc. 14 at 14; *see* Tr.401).  As noted by the Commissioner, the plaintiff was using cocaine and marijuana

24

during this period, and it was before he received any treatment (*see* Tr. 419). As noted above, mental status findings of treating outpatient providers consistently demonstrate the plaintiff had an intact memory with intact attention and concentration (Tr. 23-24; *see* Tr. 32-33, 307-08, 312, 419, 429-30, 434, 458-59, 500-03, 517, 522-25, 544-45).

The ALJ further noted that although the plaintiff testified to having no friends and being unable to interact with others (Tr. 19, 24), he demonstrated some ability to interact with others (Tr. 24). The plaintiff's treating outpatient providers consistently found that he was cooperative (as discussed above), and he engaged in activities requiring a certain level of interaction, i.e., he attended church, accompanied his mother to the grocery store, and dined out with his daughter (Tr. 24; *see* Tr. 46, 56-58). Although the plaintiff cites a report of an altercation at church (doc. 14 at 14), he told his provider that it was "resolved," he stated that his medication was "helpful," and his provider observed him being cooperative and gave him a GAF score of 60 (indicating only moderate-borderline-mild symptoms) (doc. 544-45). Moreover, the ALJ agreed that the plaintiff was limited to only occasional interaction with the public (Tr. 24), and the jobs identified by the vocational expert involve no significant interaction with others (Tr. 25-26, 59-60). *See* DOT No. 381.687-018, 1991 WL 673258 (janitor); DOT No. 361.685-014, 1991 WL 672986 (laundry operator); DOT No. 920.587-018, 1991 WL 687916 (hand packager) (each providing that dealing with people is "[n]ot [s]ignificant").

The ALJ further found that there "may have been another factor, such as difficulty finding a job, which motivated [the plaintiff] to apply for benefits" (Tr. 23). Specifically, the plaintiff stated at the hearing that he had difficulty finding a job due to his history of incarcerations (Tr. 56), including a five-year imprisonment lasting through September 2011, just seven months before his application date (Tr. 49-54, 56, 274, 294, 407, 423). Further, as noted above, the ALJ gave "significant weight" to the opinions of state

agency psychologists Drs. Neboschick and Hamrick, who opined that, despite the plaintiff's allegations, he could perform simple work (Tr. 24; *see* Tr. 69, 72, 91-92).

Based upon the foregoing, the undersigned finds that the ALJ's credibility analysis was without legal error and based upon substantial evidence. The ALJ reasonably found that the plaintiff's mental limitations were accommodated by a residual functional capacity limiting him to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements in a low-stress setting with only occasional interaction with the public. (Tr. 20, 23-24). Accordingly, the plaintiff's allegation of error in this regard is without merit.

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 16, 2016
Greenville, South Carolina

26